**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**JOHNNY JAMES UPSHAW,**

      **Petitioner,**

**v.**                                  **Case No.  4:14cv155-WS/CAS**

**JULIE L. JONES, Secretary,
Department of Corrections,**

      **Respondent.**
_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

On March 19, 2014, Petitioner Johnny James Upshaw, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.  This Court directed Respondent to file a response. ECF No. 7.  On January 8, 2015, Petitioner filed a motion to amend the petition to set forth additional facts.  ECF No. 12.  On January 13, 2015, the Court vacated the previous order directing the Respondent to file an answer and granted the Petitioner's motion for leave to amend the petition. ECF No. 13.  Petitioner was directed to file an amended § 2254 petition on the form required by Rule 2(c), R. Gov. § 2254 Cases in U.S. Dist. Cts., and to set forth grounds and supporting facts.  ECF No. 13 at 2.  The order

further directed the substitution of Julie L. Jones, Secretary of the Florida Department of Corrections, as Respondent.  ECF No. 13 at 3.[1]

Upshaw's amended § 2254 petition was filed on March 4, 2015, ECF No. 16, challenging his convictions and thirty-year concurrent habitual felony offender sentences entered by the Circuit Court for the Third Judicial Circuit, Taylor County, Florida, on October 6, 2008 for: Count (1) trafficking in cocaine weighing 28 grams or more but less than 200 grams; and Count (2) conspiracy to commit the offense of trafficking in cocaine weighing 28 grams or more but less than 200 grams.  Ex. L.[2]  On July 1, 2015, Respondent filed an answer with exhibits, ECF No. 19, and Petitioner filed a reply with memorandum of law on August 28, 2015.  ECF No. 25.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).  After careful consideration of all the issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this case.  *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.  For the reasons set forth herein, the

---

[1] Julie L. Jones became Secretary of the Department of Corrections on January 5, 2015.  *See* Federal Rule of Civil Procedure 25(d).

[2] Hereinafter, all citations to the State court record will refer to exhibits submitted with Respondent's answer, ECF No. 18.

pleadings and attachments before the Court show that Petitioner is not

entitled to federal habeas relief and this § 2254 petition should be denied.

## Background and Procedural History

By amended information filed September 9, 2008, Petitioner was

charged in case number 2007-325-CF-(A) with two counts in connection

with events that took place on October 9, 2007, in Taylor County, Florida.

Ex. A.  Count (1) charged trafficking in cocaine weighing 28 grams or more

but less than 200 grams in violation of section 893.135, Florida Statutes;

and Count (2) charged conspiracy to commit trafficking in cocaine weighing

28 grams or more but less than 200 grams in violation of sections

777.04(3) and 893.135, Florida Statutes.  Ex. A.  Petitioner was also

charged by separate amended information filed on September 9, 2008, with

one count of possession of a firearm by a felon in violation of section

790.23, Florida Statutes, for which a nolle prosequi was later entered.  Ex.

A, J.

Petitioner filed a motion to suppress evidence obtained in a search

executed pursuant to a warrant.  Ex. D.  An evidentiary hearing was held

on that motion on August 21, 2008, Ex. E, after which the trial court entered

an order denying the motion.  Ex. G.  Jury trial was held September 9-10,

2008, Ex. H, at which Petitioner did not testify.  Ex. H. at 297.  The jury

found Petitioner guilty as charged in Counts (1) and (2).  Ex. H at 356; Ex. I.

Judgment and sentence were entered October 6, 2008, and Petitioner was sentenced to two concurrent thirty-year prison terms as a habitual felony offender pursuant to section 775.084(4)(a), Florida Statutes. Ex. L at 3, 5.  Petitioner received 362 days credit for time served.  Ex. L at 4, 6.  Petitioner appealed to the First District Court of Appeal raising one claim—that the trial court erred in denying the motion to suppress.  Ex. N. The First District Court of Appealed affirmed per curiam without a written opinion on September 7, 2010, and the mandate was issued September 23, 2010.  Ex. P, Q; *see* Upshaw v. State, 43 So. 3d 699 (Fla. 1st DCA 2010).

On December 1, 2011, Petitioner filed a pro se motion for post-conviction relief in the state trial court under Florida Rule of Criminal Procedure 3.850, raising six claims of ineffective assistance of counsel and one claim of cumulative error.  Ex. R  An amended 3.850 motion was filed April 25, 2012, amending Petitioner's claim 3 concerning trial counsel's performance in investigating witnesses and preparing for trial.  Ex. T.  The state trial court granted an evidentiary hearing on claim four, which alleged that counsel was ineffective in affirmatively misadvising Petitioner

concerning his right and his decision to testify and confront witnesses.
Ex. U.  After the state court ruled that he would not be appointed counsel
for the evidentiary hearing, Ex. U, Petitioner represented himself at the
hearing held June 6, 2013.  Ex. V.

The state court denied post-conviction relief in an order entered July
5, 2013.  Ex. W.  In that order, pertinent to the issues raised in Upshaw's
§ 2254 petition in this Court, the state court ruled that trial counsel was not
deficient in his advice to Petitioner concerning the risks of testifying.  Ex. W
at 5-8.  The court also ruled that trial counsel was not ineffective in failing to
strike or challenge Juror N as biased because of his views on illegal drugs.
Ex. W at 8-10.

Petitioner, pro se, appealed the denial of post-conviction relief to the
Florida First District Court of Appeal, raising three points of error: (1) failure
to appoint post-conviction counsel; (2) failure to find trial counsel
misadvised Petitioner concerning the risks of testifying; and (3) failure to
find ineffective assistance of counsel concerning Juror N.  Ex. X.  The
appellate court affirmed per curiam without written opinion on January 23,
2014.  Ex. Z.  After rehearing was denied, Ex. BB, the mandate was issued
on March 31, 2014.  Ex. CC; *see* Upshaw v. State, 133 So. 3d 934 (Fla. 1st
DCA 2014).

As indicated above, Upshaw filed a petition and amended petition for writ of habeas corpus in this Court pursuant to 29 U.S.C. § 2254 raising three grounds for relief:

(1) The State secured its conviction through violation of the U.S. Constitution's Fourth Amendment by failing to suppress the evidence seized in violation of the knock and announce requirements when executing a search warrant.  ECF 16 at 4.

(2) Trial counsel was ineffective by providing misadvice as to the ramifications of Petitioner testifying in his own behalf, in violation of the U.S. Constitution's Sixth Amendment.  ECF 16 at 6.

(3) Trial counsel was ineffective for allowing a biased juror to sit on Petitioner's jury trial, in violation of the U.S. Constitution's Sixth Amendment.  ECF 16 at 7.

## <u>Analysis</u>

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody.  Section 2254(d) provides in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See, e.g.,* Cullen v. Pinholster, 563 U.S. 170, 181

(2011); Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011).  "This is a

'difficult to meet' and 'highly deferential standard for evaluating state-court

rulings, which demands that state-court decisions be given the benefit of

the doubt.'"  Cullen, 563 U.S. at 181 (quoting Harrington v. Richter, 162

U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

This Court's review "is limited to the record that was before the state court

that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1388.

 For claims of ineffective assistance of counsel, the United States

Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  To demonstrate

deficient performance, a "defendant must show that counsel's performance

fell below an objective standard of reasonableness."  *Id.* at 688.  To

demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* For this Court's purposes, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles, 556 U.S. at 123. It is a "doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard." *Id.*

### Ground 1—Motion to Suppress

In this first ground, Upshaw seeks § 2254 habeas relief based on the contention that the State secured his conviction through violation of the Fourth Amendment to the United States Constitution by failing to suppress the evidence seized in violation of Florida's knock and announce statute when executing a search warrant. ECF 16 at 4. In the trial court, Upshaw filed a motion to suppress alleging that the officers who served the search

warrant on the residence where Petitioner was said to be residing failed to follow the State's "knock and announce" statute, section 933.09, Florida Statutes (2007), by failing to wait a sufficient time to allow the occupants to answer the door before entering.  Ex. D; Ex. N at 9.

Section 933.09, Florida Statutes (2007), states:

> The officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of the officer's authority and purpose he or she is refused admittance to said house or access to anything therein.

In determining if the time delay meets Florida's knock and announce statute, Florida law provides that "[t]here is no bright line answer; the only answer found in our case law is that the occupant must have a 'reasonable opportunity' to respond.  Time periods less than five seconds are rarely deemed adequate, and periods in excess of fifteen seconds are often adequate."  State v. Pruitt, 967 So. 2d 1021, 1023 (Fla. 2d DCA 2007).  Factors that courts have considered include the nature of the underlying offense, whether any activity or movement is observed within the home at the time of execution, and whether any exigencies exist.  Mendez-Jorge v. State, 135 So. 3d 464, 467 (Fla. 5th DCA 2014).  "In the face of exigent circumstances, such as the imminent destruction of evidence, 'the amount of time preceding entry is less imperative.'  Needless to say, the fact-

specific nature of the reasonableness inquiry has resulted in different outcomes for similar time frames." Id. (quoting Pruitt, 967 So. 2d at 1026).

The circumstances alleged by Petitioner Upshaw to have violated the State's knock and announce statute were failure to wait a sufficient amount of time after knocking and announcing before entering through an unlocked door, and the lack of exigent circumstances to excuse that failure. Ex. E at 42-44. The state trial judge denied the motion to suppress, concluding in a written order that the evidence presented at the hearing on the motion to suppress demonstrated the officers executing the search warrant knocked at the door, announced their presence, and then waited approximately two seconds before entering the unlocked door. Ex. G. The judge further found in the order that entry after two seconds was reasonable because of articulable, specific facts contained in information possessed by the officers that showed exigent circumstances. Ex. G. The judge stated on the record of the hearing:

> The Court finds that there was more than a generalized law
> enforcement knowledge present. That there was a specific
> knowledge about recent situations involving the Defendant and
> firearms. They had reasonable cause to believe that he was
> present in the home, armed and dangerous . . . .

Ex. E at 51. The judge further concluded that the Fourth Amendment has not been violated. Ex. E at 51. After the jury trial at which the challenged

evidence was presented, Petitioner appealed this issue to the Florida First District Court of Appeal, which affirmed without opinion.  *See* Upshaw v. State, 43 So. 3d 699 (Fla. 1st DCA 2010).  This affirmance constitutes a denial on the merits.  *See, e.g.*, Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).

In his state appeal, Petitioner relied on state law grounds and did not expressly contend a Fourth Amendment violation had occurred; although the State in its answer brief mentioned the Fourth Amendment in the standard of review section and discussed the requirements of the knock and announce rule, citing several federal cases.  Ex. O at 14-17 & n. 4. Petitioner did not file a reply brief in the appellate court.  Because Petitioner did not present the claim to the state courts as a violation of the United States Constitution, but argued a violation of state law, the claim is not cognizable on federal review.

"It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."

O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b).

The exhaustion doctrine is designed to give the state courts a "full and fair

opportunity to resolve federal constitutional claims before those claims are

presented to the federal courts." *See id.* at 845. "[T]he petitioner must

have given the state courts a 'meaningful opportunity' to address his

federal claim." Preston v. Secretary, Florida Dep't of Corr., 785 F.3d 449,

457 (11th Cir. 2015) (quoting McNair v. Campbell, 416 F.3d 1291, 1302

(11th Cir. 2005)). To the extent that Petitioner did not give the state courts

a meaningful, or full and fair, opportunity to address this federal claim, it is

therefore unexhausted and procedurally defaulted.

Regardless of any procedural default, the claim should be denied on

the merits. The trial court made findings of fact after hearing testimony at

the evidentiary hearing on the motion to suppress. "Factual determinations

by state courts are presumed correct absent clear and convincing evidence

to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a

state court and based on a factual determination will not be overturned on

factual grounds unless objectively unreasonable in light of the evidence

presented in the state-court proceeding, § 2254(d)(2)." Miller–El v.

Cockrell, 537 U.S. 322, 340 (2003). The Petitioner had the burden of

rebutting the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The facts presented at the evidentiary hearing on the motion to suppress are undisputed that, in executing the search warrant, the officers did knock and announce their presence, but waited only several seconds before entering through the unlocked door.  In dispute was whether several seconds delay met the requirements of the state knock and announce statute and, if not, whether the officers had reasonable suspicion that waiting a longer period of time after knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

At the motion to suppress hearing, City of Perry Police Officer Bruce H. Griffin testified that he had been a police officer for 28 ½ years and was involved in the execution of the search warrant on October 9, 2007.  Ex. E at 6.  Officer Griffin testified:

> Q  Did you have any specific information that any of the occupants of the building were armed or dangerous?
>
> A  Yes.
>
> Q  And what was that information?

A  That Mr. James was known to carry - - Johnny James was known to carry a firearm and we were to expect resistance from him specifically.

Q  Okay.  And who gave you that instruction?

A  It was part of the general instructions for the search warrant by Mike Anderson, Dwayne Bratcher.

Q  And so based on that you entered with a drawn taser?

A  Yes, sir.

Ex. E at 8.  On cross-examination, Officer Griffin further testified:

Q  Officer Griffin, were you aware, or did you have any information that there could have been firearms in the house?

A  Yes.  We were instructed that there were known to be firearms in the residence.

Q  Okay.  And who instructed you?

A  It was part of the pre-warrant, the pre-search warrant briefing we had and Mike Anderson and Dewayne Bratcher were doing them.

Q  All right.

A  I believe that Captain Crews was also part of that.

. . . .

Q  . . . .  Were you aware of what evidence you were searching for inside the residence?

A  It was narcotics, specifically crack cocaine.

Q  Okay.  And again, you testified earlier about how long you have been a law enforcement officer?

A  28 ½ years.

Q  All right.  In your experience as a law enforcement officer, have you ever executed a search warrant searching for cocaine?

A  Probably a couple hundred.

. . . .

Q  Have you ever known of any of those occasions where people have tried to dispose of the cocaine while you were trying to execute the warrant?

A  Many of times.
. . . .

Q  Was that a concern of yours in executing this search warrant, that if you knocked and announced and waited for an answer that the cocaine would be disposed of (inaudible)?

A  And/or the possibility of someone becoming armed against us.

Ex. E at 10-13.

City of Perry Police Officer Michael Franklin, when asked about the information he was given before executing the search warrant, testified: "We'd had several bits of information about the subject being armed, about him having large quantities of drugs with him, about his violent nature and things of that sort."  Ex. E at 16-17.  He received some of this information from Detective Anderson, but "[s]ome of it I had prior knowledge to because of working the street and knowing Mr. Upshaw and dealing with

Mr. Upshaw."  Ex. E at 17.  When asked what he had learned on the street,

Officer Franklin testified, "We'd gotten word on the street that he had been

sorta less jacking (sic) drug dealers, putting guns in their faces."  Ex. E at

17.  He agreed this information was not "first hand."  Ex. E at 27.

Officer Franklin explained that prior to the execution of the search

warrant, Detective Anderson had told him that they were looking for two

individuals—one of whom was Upshaw—and that he was "armed and,

indeed, dangerous."  Ex. E at 18.  Officer Franklin testified he was aware of

Upshaw's criminal history and considered him a violent person based on

his dealings with Upshaw in the past and the nature of the calls the officer

had to answer in which Upshaw was involved.  Ex. E at 23.

Officer Franklin explained what transpired before the officers entered

the residence:

> Q  What signal, was there some kind of pre-arranged
> signal of some kind, some kind of event that would happen that
> would cause y'all to make the entry?
>
> A  Detective Anderson give us the go signal which he was
> part of the team as well.  We pulled up to the residence,
> stacked outside the residence, moved to the door, at which
> point that when we knocked on the door, or I knocked on the
> door, announced that we was the Police Department and we
> had a search warrant.  Tried the door knob, it was unlocked. I
> opened the door to drop my breaching tool and made entry into
> the house.
>
> . . . .

 Q Okay. How much time elapsed between the time you announced  - - between your knock and announce that you actually  - -

 A I knocked on the door, announced Police Department search warrant and then at that point tried the door knob, which the door was opened and I opened the door. A couple seconds.

 Q Okay. So just that quick?

 A Yes, sir.

Ex. E at 19-20. Officer Franklin agreed he had information that there were

"possibly" firearms in the residence. Ex. E at 22. Officer Franklin also

testified that based on his experience with persons attempting to dispose of

controlled substances when a search warrant is being executed, he was

also concerned that if he waited for an answer after knocking and

announcing, the controlled substances would have been disposed of. Ex.

E at 25.

 City of Perry Police Detective Mike Anderson, assigned to the drug

task force, testified about the briefing he conducted before execution of the

search warrant:

 Q If you will, tell us what you told them [the entry team]?

 A We received information of Mr. Upshaw being in possession of a pistol . . . .

 . . . .

> A  That the possibility of firearms being in the house.  The
> information that I received was that Mr. Upshaw had
> brandished a pistol on two individuals that owed him money
> and that he had actually pulled a pistol on an individual involved
> in a drug deal with him.

Ex. E at 33.  When asked how current the information was, Detective

Anderson said he obtained the information two or three weeks before

"[f]rom a source that stated that he had threatened him with a pistol.  And

the other guy we got the information from him after we interviewed him at

the county jail."  Ex. E at 33, 36.  Detective Anderson testified that he was

aware of Upshaw's criminal history, which included several drug and

firearm offenses.  Ex. E at 38.  He agreed, however, that no one saw

Upshaw enter the house with a firearm on the day the warrant was

executed and he had no information that the persons in the residence

intended to destroy the evidence, although that was a concern.  Ex. E at

33, 39.  Two firearms were found in the residence at the time of the

warrant.  Ex. E at 37.

After hearing the evidence and argument of counsel, the trial judge

ruled

> [T]he evidence presented and elicited here through testimony of
> sworn officers give sufficient articulable facts to allow the entry
> into the residence that was occupied by the Defendant after
> waiting as little as two seconds after the announcement of the
> purpose for their presence.  The [c]ourt finds that there was

more than generalized law enforcement knowledge about
recent situations involving the Defendant with firearms.  They
had reasonable cause to believe that he was present in the
home, armed and dangerous, and for all the other reasons cited
by the State, and the Court further finds the [Kellom v. State,
849 So. 2d 931 (Fla. 1st DCA 2003)] case is distinguishable
from the case because there was more than generalized
knowledge elicited from the Officers.

      The Fourth Amendment has not been violated and the
knock and announce rule or statutory provision has not been
violated due to the exigent circumstances present in this case.
The motion to suppress is, therefore, denied.

Ex. E at 50-51; Ex. G (written order).

The trial court found as fact that the officers had sufficient articulable

factual information to justify their entry into the residence several seconds

after Officer Griffin knocked and announced.  This finding after an

evidentiary hearing is presumed correct, and Petitioner has not proven by

clear and convincing evidence that the factual premise was incorrect.  *See*

§ 2254(e)(1).  This deference "does not imply abandonment or abdication

of judicial review;" and a federal court can conclude that the decision was

unreasonable when guided by the AEDPA.  Miller-El v. Cockrell, 537 U.S.

at 340.  In this case, however, the state court's factual determinations after

the evidentiary hearing were not "objectively unreasonable in light of the

evidence presented in the state-court proceeding."  *Id.* (citing § 2254(d)(2)).

Nor was the state courts' refusal to apply the exclusionary rule

contrary to, nor did it involve, an unreasonable application of a clearly

established Federal law, as determined by the United States Supreme

Court.  *See* § 2254(1).  In Hudson v. Michigan, 547 U.S. 586 (2006), the

Supreme Court made clear that the question of whether a Fourth

Amendment violation has occurred in any case is separate from the

question of whether exclusion of the evidence is required.  *See id.* at 591.

The Court reiterated that it has rejected indiscriminate application of the

exclusionary rule and has held it applicable "where its deterrence benefits

outweigh its 'substantial social costs.' "  *Id.* (quoting Penn. Bd. of Probation

and Parole v. Scott, 524 U.S. 357, 363 (1998)).  The Supreme Court in

Hudson explained that the interests that are protected by the knock and

announce rule—such as providing the occupants time to dress or prepare

themselves to see the police, or prevention of property damage by forcible

entry—do not include "an interest in preventing the government from

seeing or taking evidence described in a warrant."  Hudson, 547 U.S. at

594.  The Court explained:

> Unlike the warrant or *Miranda* requirements, compliance with
> which is readily determined (either there was or was not a
> warrant; either the *Miranda* warning was given, or it was not),
> what constituted a "reasonable wait time" in a particular case . .
> . (or, for that matter, how many seconds the police in fact
> waited), or whether there was "reasonable suspicion" of the sort
> that would invoke the [*Richards v. Wisconsin, 520 U.S. 385
> (1997)*] exceptions, is difficult for the trial court to determine and
> even more difficult for an appellate court to review.

> Another consequence of the incongruent remedy Hudson
> proposes would be police officers' refraining from timely entry
> after knocking and announcing.  As we have observed, see
> *supra,* at 2163, the amount of time they must wait is necessarily
> uncertain.  If the consequences of running afoul of the rule were
> so massive, officers would be inclined to wait longer than the
> law requires—producing preventable violence against officers
> in some cases, and the destruction of evidence in many others.
> . . .   We deemed these consequences severe enough to
> produce our unanimous agreement that a mere "reasonable
> suspicion" that knocking and announcing "under the particular
> circumstances, would be dangerous or futile, or that it would
> inhibit the effective investigation of the crime," will cause the
> requirement to yield.  *Richards, supra,* at 394.
>
> Next to these "substantial social costs" we must consider the
> deterrence benefits, existence of which is a necessary condition
> for exclusion.  (It is not, of course, a sufficient condition: "[I]t
> does not follow that the Fourth Amendment requires adoption of
> every proposal that might deter police misconduct."  [U.S. v.
> Calandra, 414 U.S. 338, 350 (1974]. To begin with, the value of
> deterrence depends upon the strength of the incentive to
> commit the forbidden act.  Viewed from this perspective,
> deterrence of knock-and-announce violations is not worth a lot.

Hudson, 547 U.S. at 595-96 (some citations omitted).  Therefore, even if

the state courts' refusal to exclude the evidence was based on an incorrect

finding that the state statute was not violated and suppression should have

been ordered as a matter of state law,[3] that state law error would not be the

basis of federal habeas relief under § 2254.  Hudson makes clear that

---

[3] The Florida Supreme Court concluded in its decision in State v. Cable, 51 So.
3d 434 (Fla. 2010), that Hudson does not mandate that Florida recede from precedent
that requires suppression for violation of Florida's knock and announce statute because
that precedent is based on Florida law.

suppression of evidence is not required in every case in which the knock

and announce statute is violated.  Therefore, denial of suppression of the

evidence seized under the search warrant has not been shown to be

contrary to, or involving an unreasonable application of, clearly established

federal law, as determined by the Supreme Court.  Nor has it been shown

that the trial court's factual determinations after the evidentiary hearing

were objectively unreasonable.

For all these reasons, this ground should be denied.

## Ground 2— Misadvice of Counsel Claim

In this ground, Petitioner contends that trial counsel affirmatively

misadvised him concerning his right to testify, and the risks attendant to

doing so, by advising him that if he chose to testify the State would be able

to go into specific details about his prior convictions.  ECF 16 at 6.  He

contends that this misadvice resulted in prejudice because it allowed the

State's purely circumstantial case to go unchallenged.  He argues that

there was no direct evidence of his guilt because he did not have any

controlled buys and the only evidence of conspiracy was provided by other

suspects at the scene.  Petitioner contends that the post-conviction court

had no basis to find his trial counsel's testimony more credible than his

own.

This same claim was raised in state court in Petitioner's 3.850 motion and denial of relief was appealed to the First District Court of appeal, where it was affirmed per curiam without opinion.  Ex. Z.  To obtain federal relief, Petitioner must show that his lawyer's performance fell below an objective standard of reasonableness and that the deficient performance caused prejudice.  Strickland, 466 U.S. at 687.

Petitioner was afforded an evidentiary hearing on this claim, where he and his trial counsel testified.  Petitioner testified that during the trial, his attorney told him "a couple different times" that "for me to take the stand that the State would bring up my priors and be specific about it," and that because he had prior convictions, "that wouldn't be no good idea."  Ex. V at 7-8 (transcript).  When asked what his trial counsel told him, Petitioner testified:

> **THE DEFENDANT:**  I don't remember exactly how he put it, but I mean, it was more or less him saying if I take the stand that they would let them know that, not only my priors, but the specifics of them and that that wouldn't be a good idea for me to take the stand.  Because, you know, they would know that I was a drug - -  ex-drug dealer, you know, whatever, like that.
>
> . . . .
>
> **THE DEFENDANT:**  . . . .  He just told me that, you know, if I take the stand, the State would, you know, bring up my past about the drug charges.  And that - -
>
> . . . .

> **THE COURT:**  Okay.  Anything further that you want to tell the Court about what you recall being told by Mr. Davis that led you to elect not to testify?

> **THE DEFENDANT:**  No, sir, not other than he had me up under the impression that they would know that I was selling drugs, I been busted for drugs before, pretty much.  And I didn't want them to know that, so that's why I didn't testify, as far as that particular  - -

Ex. V at 8-10 (transcript).  Petitioner's trial counsel was called to testify by

the State and testified concerning what he told Petitioner as follows:

> Q  Did you talk to Mr. Upshaw about the fact that he had a right to testify at the trial?

> A  Yes.  Mr. Upshaw had quite a bit of experience with the legal system and he asked appropriate questions.  And, you know, he was pretty knowledgeable of the way the process worked.  So we had a lot of conversations about the evidence and a wide-range trial strategy, his rights, subpoenaing witnesses, a pretty broad-range discussion about how to put on a trial and defend him.

> Q  Did you advise him that his prior convictions could be used to impeach him on the stand?

> A  Probably the words I said - - because that's normally what I say, is that if you testify, your prior criminal history comes into play.  And it comes into play in several ways.  You can be impeached with certain convictions.  If you testify and make statements that are inconsistent with your prior history, like I have no knowledge of the drug business and you've been convicted of drugs in the past, there are circumstances under, I think Rule 6.08 where you can be impeached, at least by asking the questions.

Q  Did you tell Mr. Upshaw that if he were to testify that the State could bring out the fact that he was a drug dealer if he took the stand?

A  I don't think I would have done it in those words.  I think I'm more general is that your prior history becomes a feature and you can be impeached and you can open up the door for drug convictions to come out, depending on how you testify.

Q  Did you advise Mr. Upshaw not to testify?

A  I don't think so.  I don't do that.  I had a case come back one time, a federal case where I did so.  And I've never done that since.

Q  Was that before or after this case?

A  Before this case.

Ex. V at 13-15 (transcript).   Mr. Davis also testified that the circumstances

of the case were that Upshaw had no drugs on him; it was not his house;

the sale had been made by someone from that house other than Upshaw;

and the drugs were found on a table in the house.  He testified:

A . . . .  And so the defense was based on the circumstances that could be proven through either the police officers or the people that were there at the house or the cooperating witnesses; which I think there was at least one, if not two.
And I think I probably discussed with him the fact that I didn't think his testimony would add or detract from those circumstances.  The circumstances were what they were.  And that he would take the risk of putting into issue certain parts, if not a lot of his prior criminal history.

Q  But you did, you fully explained to Mr. Upshaw his right to testify and that his prior convictions could be used against him.  You did not, however, tell him this his prior drug convictions could be used unless he opened the door, essentially?

A  That's my recollection, yes.

Ex. V at 15 (transcript).  After trial counsel testified, Petitioner was allowed

to add additional testimony, stating:

**THE DEFENDANT:**  The understanding that I had from what he said to me was that if I take the stand, that it was just automatic, that being the case.  Not having nothing to do with how I answer the questions or - -

**THE COURT:**  That what would be automatic?"

**THE DEFENDANT:**  About my specifics of my prior.

Ex. V. at 17 (transcript).

When trial counsel was asked by the court whether he advised

Upshaw about the limited nature of how the specifics of his prior

convictions could be brought out by the prosecutor, Mr. Davis testified:

A  You know, again, that's a matter of recollection. Generally - -  and I've probably counseled several hundred people since Mr. Upshaw's trial, but generally I explain that prior convictions themselves, if they are felonies or for bad - - dishonesty, even if misdemeanors, can be numerically put into evidence.

Q  And when you say numerically, just for the record, you mean?

A  How many times have you been convicted of either a
felony or a - - and that's the question that I always ask and
that's the question that the prosecutors will ask.  And that
depending on this responses to questions, it could bring the
specifics of his drug history into play.  I tell everybody that.

. . . .

Q [by the court]  And did you - -  and I think what I heard
him say is that depending on the response, that it's possible
that there could be more detail about those convictions; is that
essentially what you told him?

A  Yes, sir.  I do recall explaining that.  Because the
circumstances of this case was he came into a house where
drugs had been sold out the house.  The lady that had sold the
drugs and rented the house was the primary witness against
him.
He came in, police took him down, he was down under a
coffee table or down by somewhere in the kitchen, or around
the table on the floor, and if he said he didn't know what he was
doing there or if he didn't recognize that those were drugs,
questions that would get asked, it could potentially open up
questions about haven't you had felony conviction for drugs
before.

. . . .

Q  And are you fairly certain that that is the routine you
followed in this particular case?

A  I would be as certain as you can be about something
that happened eight or ten years ago.

Ex. V. at 18-20 (transcript).  Trial counsel denied that it was possible he

told Petitioner that if you testify, the jury is going to learn about everything

and the details of your convictions.  Ex. V at 21.  He also denied Upshaw's

allegation that Upshaw begged to be allowed to testify.  Ex. V. at 24-25

(transcript).  When the court asked Petitioner whether, in deciding to testify,

he would have weighed the fact that the jury would learn he had at least

five felony convictions, Petitioner responded:

> **THE DEFENDANT:**  Would I have weighed it?  Well, at
> the time I was talking to him I wanted to testify.  So, I mean, if I
> had to sit and think about it for a while, I don't know.  But just
> them times I talked with him I was wanting to testify.

Ex. V. at 28 (transcript).  When asked for further explanation, Upshaw

testified he "still would have testified" and what he wanted to say

outweighed the fact that he had five felonies.  Ex. V at 29 (transcript).

The trial court denied the claim and entered an order on July 5, 2013,

denying relief on this ground.  Ex. W at 5.  The court found that the claim,

as stated in the 3.850 motion, was based in large part on Petitioner's

erroneous understanding that "the State could never proffer any details of

his prior convictions."  Ex. W at 5 (citing motion, Ex. R at 14).  The post-

conviction court also found that Petitioner had eight prior felony convictions

and "[e]ven if the State had only asked the Defendant whether and how

many felony convictions he had, and the Defendant had answered

truthfully, it would have been reasonable for Counsel to have believed the

jury would have looked unfavorably upon the fact that the Defendant had

eight felony convictions prior to those for which he was on trial." Ex. W

at 5.

The court also noted that the trial record reflected Petitioner advised

the trial court that it was his own decision not to testify, citing the following

colloquy which occurred after the defense rested its case:

> **THE COURT:** . . . Mr. Upshaw, you understand you have an absolute right to testify in this matter if you want to testify"
>
> **THE DEFENDANT:** Yes, sir.
>
> **THE COURT:** Have you gone over your rights concerning this with your attorney?
>
> **THE DEFENDANT:** Yes, sir.
>
> **THE COURT:** Is it your decision to not testify in this matter?
>
> **THE DEFENDANT:** Yes, sir.
>
> **THE COURT:** After discussing it with your lawyer?
>
> **THE DEFENDANT:** Yes, sir.
>
> **THE COURT:** You feel it's in your best interest not to testify?
>
> **THE DEFENDANT:** Yes, sir.
>
> **THE COURT:** Did you have any other questions about the right you have about giving testimony or not giving testimony?
>
> **THE DEFENDANT:** No, sir.

> **THE COURT:**  This is what you want to do?
>
> **THE DEFENDANT:**  Yes, sir.
>
> **THE COURT:**  You need to talk with your lawyer any further about this?
>
> **THE DEFENDANT:**  No, sir.  No, I don't.

Ex. H at 297-98.  The post-conviction court found that the Petitioner is bound by the answers he gave in this colloquy at trial, but the court's decision to deny post-conviction relief was based on the evidence presented at the evidentiary hearing to support his conclusion that trial counsel did not affirmatively misadvise Petitioner.  Ex. W at 6.

In denying relief, the court found as fact, based on competent substantial evidence, that trial counsel discussed with Upshaw the decision whether to testify; that his criminal history would come into evidence, possibly in several ways; that counsel normally advises clients that their record could become a feature of the trial if the door is opened; that counsel did not advise Upshaw not to testify; that counsel believed Upshaw's testimony would not add or detract from the trial; and that he would not have advised a client that the details of a criminal conviction would automatically come into evidence.   Ex. W at 7-8.  The court found the testimony of Mr. Davis more credible than that of the Petitioner and

found his version of events more believable.  Finally, the court concluded that trial counsel did not provide affirmative misadvice to Petitioner or render deficient performance.  Ex. W at 8.  The post-conviction court was correct in concluding as a factual matter that trial counsel did not misadvise Petitioner concerning the decision to testify, and in finding that counsel reasonably believed the jury would have looked unfavorably on Petitioner's eight felony convictions.  Ex. W at 5-7.

On the question of prejudice, the post-conviction court found that Petitioner failed to demonstrate that his decision not to testify would have been different if he fully understood that the jury would have learned of his criminal history; and that he failed to disclose what testimony would have been presented had he testified.  The court concluded that Petitioner failed to show a reasonable possibility that the outcome of the trial would have been different if he had not suffered the alleged deficient performance of counsel.  Ex. W at 8.

This ruling, and the state appellate court's affirmance, are entitled to AEDPA deference, and review is limited to the record before the state court.  Under 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by a State court shall be presumed to be correct and the Petitioner has the burden of rebutting this presumption by clear and convincing

evidence. The record supports the post-conviction court's findings and Petitioner has not met his burden under the AEDPA to rebut the correctness of the findings.

Petitioner contends that his failure to testify was prejudicial because without his testimony, there was nothing to rebut the State's purely circumstantial case. The record belies this contention. Evidence presented at trial showed that when the search warrant was executed, Upshaw was in the residence where crack cocaine was found on a table in the kitchen near where he was standing. Ex. H at 119-20; 214-17. Detective Anderson testified that cocaine was also found in a dresser and a safe located in a bedroom said to be used by Upshaw and Lindsay Overstreet, a female resident. Ex. H at 120. Two handguns were also found in the safe. Ex. H at 126. A prescription pill bottle with Upshaw's name on it was found on the dresser next to a mirror with cocaine residue and a razor blade on it. Ex. H at 132.

On cross-examination by Petitioner's counsel, Detective Anderson agreed Petitioner had not admitted any of the drugs found in the residence were his. Ex. H at 141-42. Counsel elicited testimony that Upshaw's name is not on the utilities account for the residence, and that the property was owned by Lindsay Overstreet's grandmother. Ex. H at 144-45. Detective

Anderson was questioned about a controlled drug buy made in the residence, and agreed that the drug purchase was made from Overstreet and that Upshaw was not present.  Ex. H at 145-46.  Detective Anderson testified that no drugs, house keys, or safe key were found on Upshaw.  Ex. H at 148.  Detective Anderson agreed Petitioner's fingerprints were not found on any of the drugs or other items found in the home.  Ex. H at 149. The detective agreed no drugs were found in the car Upshaw had been seen driving, which was parked outside the residence.  Ex. H at 150.

Petitioner has not shown a reasonable possibility that if he had testified, the result of the trial would be different.  The facts that Petitioner contends he could have testified to were brought out in this cross-examination.  As his trial counsel explained at the post-conviction evidentiary hearing, Petitioner's testimony "would not add or detract" from the evidence, but that by testifying, Petitioner "would take the risk of putting into issue certain parts, if not a lot of his criminal history."  Ex. V at 15.  The State presented testimony from an individual who said that on October 8, 2007, he purchased cocaine from Petitioner and Overstreet in their "home" where the search occurred the next day.  Ex. H at 166, 168.  Lindsay Overstreet testified that she and Petitioner lived in the residence that was the subject of the search warrant.  Ex. H at 204-05.  She testified the crack

cocaine she was cutting up in the kitchen on October 9, 2007, was in plain view and within view of Petitioner, and that they sold cocaine together in an ongoing operation.  Ex. H at 214-17.  Based on all the evidence presented by the State from which the jury could, and did, find Petitioner guilty of both charges, Petitioner has failed to prove the prejudice prong of <u>Strickland</u>.

For all these reasons, this ground should be denied.

## <u>Ground 3—Biased Juror</u>

In Ground 3, Petitioner contends that trial counsel was ineffective for failing to strike or challenge Juror N for being biased due to his dislike of illegal drugs and drug dealers.  ECF 7-8.  Petitioner contends that when asked if he could be impartial, Juror N stated he "probably could," which put counsel on notice of the bias.  Petitioner raised this claim in his 3.850 motion.  Ex. R at 17-20.  No evidentiary hearing was held on this ground and the post-conviction court denied relief.  Ex. W at 8-10.  The court concluded that Petitioner did not object prior to the juror being sworn and that he failed to prove actual bias on the part of Juror N.  Ex. W at 9.  The denial of relief was appealed to the First District Court of Appeal, Ex. at 19, which affirmed per curiam without a written opinion.  Ex. Z.

The Florida Supreme Court explained in <u>Carratelli v. State</u>, 961 So. 2d 212 (Fla. 2007):

> "[T]he test for prejudicial error in conjunction with a direct appeal is very different from the test for prejudice in conjunction with a collateral claim of ineffective assistance." *Sanders v. State,* 847 So. 2d 504, 506 (Fla. 1st DCA 2003) (en banc) (quoting *Hill v. State,* 788 So.2d 315, 318 (Fla. 1st DCA 2001)), *approved,* 946 So. 2d 953 (Fla.2006). On direct appeal, to obtain a new trial a defendant alleging the erroneous denial of a cause challenge must show only that preserved error occurred. *See Goodwin v. State,* 751 So. 2d 537, 544 (Fla.1999). To obtain postconviction relief, however, the standard is much more strict.

*Id.* at 317-18.  In order to establish ineffective assistance of counsel in failing to exercise or preserve a challenge to a potential juror, the Petitioner must establish both deficient performance and prejudice under Strickland. *See* Carratelli, 961 So. 2d at 320 (citing Strickland, 466 U.S. at 687). "Therefore, 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.' " Carratelli, 961 So. 2d at 320.  Where a post-conviction motion alleges that trial counsel was ineffective for failing to challenge a juror, the petitioner "must demonstrate that a juror was actually biased against the defendant." *Id.* at 324.  Under this standard, the Petitioner must show that the juror was biased against the Petitioner, "and the evidence must be plain on the face of the record." Fennell v. Sec'y, Fla. Dep't Corr., 582 F. App'x 828, 832 (11th Cir. 2014) (*per curiam*) (quoting Carratelli, 961 So. 2d at 324).

Petitioner has not shown that Juror N was actually biased against him personally, but alleges that the juror's general dislike of illegal drugs and drug dealers demonstrated the necessary bias.  This is not the test.  As the post-conviction court noted, the trial transcript of voir dire showed that Juror N indicated he did have strong feelings about drugs and drug dealers. When Juror N was asked about his prior court experience, which he described as "drug related" court experience with two step-children, the following discussion occurred:

> **THE COURT:**  Well, the fact that may have been drug related would that in any way affect your ability to serve as a fair and impartial juror in this case because it does involve drugs?
>
> **JUROR N:** I think it could.
>
> **THE COURT:**  It could?
>
> **JUROR N:**  Yes.
>
> **THE COURT:**  You might - -
>
> **JUROR N:**  It's been a serious drug problem and I have a dislike for drug dealers.
>
> **THE COURT:**  I appreciate your candor.

Ex. H at 35.

When Juror N was questioned further by the prosecutor, the following exchange occurred:

> **THE PROSECUTOR:**  . . .  [Juror N]?  You have some strong feelings about drugs?
>
> **JUROR N:**  yes.
>
> **THE PROSECUTOR:**  Would that prevent you from being a fair and impartial juror in this case?
>
> **JUROR N:**  I don't know.
>
> **THE PROSECUTOR:**  Don't know?  It's hard to tell.  I appreciate your candor and I appreciate your telling me that. But you understand your role as a juror is to listen to the evidence and decide whether the State has proven the defendant is guilty of the crimes for which he is accused beyond a reasonable doubt?
>
> **JUROR N:**  Yes.
>
> **THE PROSECUTOR:**  You think you could set aside whatever you may know or feel or your attitude about drugs and be a fair and impartial juror in this case?
>
> **JUROR N:**  I probably could.  It might be difficult because I had some bad experiences with it.
>
> **THE PROSECUTOR:**  I understand.  I understand.  I appreciate your candor.  Thank you sir.

Ex. H at 42-43.  Juror N's response that he "probably could" be impartial was at worst ambiguous, and "thus, this is not a case in which the prospective juror made a clear declaration that he could not be impartial." Fennell, 582 F. App'x at 833.  Juror N later answered in the affirmative when asked: "[I]f the evidence convinces you beyond a reasonable doubt

the defendant is guilty can you find him guilty?"  Ex. H at 57.  Juror N did serve on the jury.  Ex. H at 88.

After the panel was chosen, and before the jury was sworn, the trial judge inquired of defense counsel and Petitioner whether they accepted the panel, which included Juror N.  Petitioner expressly agreed he had consulted with his counsel about the jurors and had nothing to say about jury selection other than to note that he wanted someone who was African-American on the jury, and he noted there was an African-American on his jury.  Ex. H at 88.  Petitioner twice informed the trial judge he had nothing else he wanted to say for the record and he agreed with what was announced by his attorney regarding strikes.  Ex. H at 88, 91.

The record of voir dire shows that although Juror N had strong feelings about drugs and was initially uncertain he could set aside those feelings, he later confirmed that he could follow the evidence.  Further, nothing in the record of voir dire showed he had actual bias against this defendant, either as a person or as someone accused of dealing drugs. The post-conviction court concluded that Juror N's responses showed he could be fair and impartial, and no actual bias had been shown.  Because Petitioner has not identified evidence that is "plain on the face of the record" establishing actual bias against him, *see* Fennel, 582 F. App'x at

832, he has failed to prove prejudice under the second prong of

<u>Strickland</u>'s test for ineffective assistance of counsel.  Relief on this ground

should be denied.

## Conclusion

Based on the foregoing, Petitioner Johnny James Upshaw is not

entitled to federal habeas relief.  Accordingly, the amended § 2254 petition

(ECF No. 16) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United

States District Courts provides that "[t]he district court must issue or deny a

certificate of appealability when it enters a final order adverse to the

applicant," and if a certificate is issued "the court must state the specific

issue or issues that satisfy the showing required by 28 U.S.C.

§ 2253(c)(2)."  Rule 11(b) provides that a timely notice of appeal must still

be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a "substantial showing of the denial of a

constitutional right."  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S.

473, 483-84 (2000) (explaining substantial showing) (citation omitted).

Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied. *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the amended § 2254 petition (ECF No. 16). It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on October 18, 2016.

<u>S/ Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific**

written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.